**In re Thyssen TAYLOR, Celess Taylor, Debtors.**

**Thyssen TAYLOR, Plaintiff,**

v.

**FIRST UNION MORTGAGE COMPANY, Defendant.**

**Bankruptcy No. 93–11949DAS.
Adversary No. 97–0048DAS.**

United States Bankruptcy Court,
E.D. Pennsylvania.

May 22, 1997.

Michael A. Cataldo, Philadelphia, PA, for debtor Celess Taylor.

Pauline K. Morgan, Wilmington, DE, for debtor Thyssen Taylor.

Gary McCafferty, Philadelphia, PA, for First Union Mortg. Co.

Edward Sparkman, Philadelphia, PA, for Chapter 13 Trustee.

*OPINION*

DAVID A. SCHOLL, Chief Judge.

*A. INTRODUCTION*

Before this court is, principally, the Motion ("the Motion") of the Wife Debtor seeking to modify the Debtors' Chapter 13 plan. The current plan changed a previous payoff plan into a cure plan. The Motion seeks to transform the current plan once again into a payoff plan. Also before us is an adversary proceeding ("the Proceeding") seeking to es-tablish the secured portion of the claim of the Debtors' Mortgagee at a greatly reduced figure. The Debtors also endeavor to convert their mortgage arrearages payments into a complete or nearly-complete liquidation of the Mortgagee's claim.

While we acknowledge the wisdom of decisions which have observed that confirmation of Chapter 13 plans, being readily modifiable, are not bound by strict principles of *res judicata*, we consider the instant belated efforts of the Debtors to drastically alter their plan and redesignate their arrearage payments inequitable. Therefore, we will deny the Motion and dismiss the Proceeding.

*B. FACTUAL AND PROCEDURAL HISTORY*

THYSSEN TAYLOR ("the Wife") filed a voluntary joint Chapter 13 bankruptcy case with CELESS TAYLOR ("the Husband," with the Wife, "the Debtors") on April 19, 1993, in order to save their home, located at 4943 Hoopers Street, Philadelphia, Pennsylvania 19139 ("the Home"), from foreclosure. The Debtors were initially represented by Thomas J. Turner, III. Consistent with the terms of a Stipulation of June 16, 1993 ("the Stipulation"), with First Union Mortgage Corp. ("the Mortgagee"), negotiated by Turner, the Debtors, on October 26, 1993, confirmed an Amended Chapter 13 Plan ("the 1st Plan"), which contemplated a payoff of the claim of the Mortgagee in the amount of $36,733.80, by making payments of $753 monthly for 55 months after five payments of $245/month. Turner was suspended from the practice of law on November 14, 1993. *See In re Gunn,* 171 B.R. 517, 519–20 (Bankr.E.D.Pa.1994).

The Debtors were unable to keep up with the payments to the Mortgagee as provided in the Stipulation and the 1st Plan. On October 25, 1994, the Mortgagee certified this default to the court and sought to proceed with foreclosure. The law office of Michael A. Cibik, Esquire, which at that time took over representation of many of Turner's former clients, negotiated a new settlement with

the Mortgagee. This settlement, approved November 17, 1994, included an agreement to continue the Stipulation in effect, but the 1st Plan was superseded by a new plan ("the 2nd Plan") which contemplated payments of $14,119.19 to the Mortgagee to cure mortgage arrears. In this way, the Debtors changed a payoff plan which they appeared unable to afford into a cure plan which eliminated the long-range benefits of a payoff plan.

Although the Debtors testified that they had separated even prior to confirmation of the 1st Plan, they agreed, among themselves, consistently with the terms of the 2nd Plan, that the Husband would maintain responsibility for making plan payments to the Chapter 13 trustee ("the Trustee"), then reduced to $379.92 per month, while the Wife would continue to make payments outside the Plan to the Mortgagee in the amount of $219.24 per month. Subsequent to approval of the 2nd Plan, the Wife became disabled and was no longer able to work outside the home and her sole source of income became disability benefits.

Despite these circumstances, the Wife has continued to make monthly payments to the Mortgagee without default. However, in late 1996, the Plan payments to be made by the Husband to the Trustee fell into arrears, and the Trustee, on November 4, 1996, filed a motion to dismiss the Debtors' bankruptcy case ("the TMTD"). Fearful of losing her home, the Wife sought and obtained her own counsel through the Consumer Bankruptcy Assistance Project ("CBAP"), a volunteer bar-sponsored pro bono program, to defend against the TMTD. In addition, on September 9, 1996, the Wife filed a successful Application for Entry of Wage Order, which required the Husband's employer to pay a portion of the Husband's salary directly to the Trustee to satisfy Plan obligations. After the Wage Order was fully implemented, the Husband paid additional funds to the Trustee to cure Plan arrearages. Although the TMTD has not been withdrawn formally, the testimony supported the conclusion that the Plan payments are now current and therefore the TMTD will be denied.

As of March 10, 1997, the Trustee had remitted $12,920.51 to the Mortgagee. In addition, the Wife has made payments outside the Plan totaling approximately $6,300 to the Mortgagee.

Reassessing the Debtors' entire situation, CBAP counsel investigated and ascertained that the value of the Home was less than was provided for arrears under the 2nd Plan, not to mention the $36,733.50 figure which the Debtors would have been obliged to pay pursuant to the terms of the 1st Plan. The Wife, on January 24, 1997, therefore instituted the Proceeding under 11 U.S.C. § 506(a), seeking to bifurcate the Mortgagee's claim into secured and unsecured portions.

At the initial trial date of the Proceeding on March 11, 1997, we observed that the Proceeding could succeed only if the Debtors filed a motion to further amend the Plan and convert it into a payoff plan which would liquidate the secured portion of the Mortgagee's claim. Thus, we directed that such a motion be filed by March 14, 1997, and we listed a hearing on any such motion with a continued trial of the Proceeding on April 22, 1997. The Debtors then filed the Motion requesting permission to file, as a modification of the 2nd Plan, their Second Modified Plan ("the 3rd Plan"). The 3rd Plan contemplated payment of $10,000, the alleged value of the Home, plus six (6%) percent deferral interest to the Mortgagee. Believing that the Debtors had already paid in excess of this amount on account of arrears, the Debtors requested that their arrears be credited to the loan balance and that they receive a refund from the Mortgagee if these payments exceeded the balance.

On April 22, 1997, this court conducted a hearing to consider the Motion, as well as the trial of the Proceeding. Thereafter, we issued an Order on April 23, 1997, providing that both parties had until May 9, 1997, by which to simultaneously file briefs in support of their respective positions with regard to the Motion and the Proceeding, which were timely submitted.

It was established at the hearing/trial that the mortgage to purchase the Home was

originally entered into between the Debtors and the Cameron–Brown Company ("CB") on July 19, 1985. It provided that CB would lend the Debtors $12,800 at an interest rate of 12.5% per year. The payments were to commence on September 1, 1995, and cease on August 1, 2000. In addition to being secured by the Home, the Debtors' mortgage obligation was also secured by all "appliances, machinery, furniture and equipment" contained in the Home. This mortgage was apparently subsequently assigned to the Mortgagee by CB or its assignees. Presently, a $22,000 principal balance is owed on the mortgage.

At the hearing/trial, the Wife presented the testimony of a real estate appraiser, Robert Fair of Precision Appraisal Corporation, fixing the present value of the Home at $10,000. In an attempt to establish the value as of possibly more pertinent earlier dates, Fair testified that, upon reviewing sales data for other properties in the neighborhood of the Home, he could discern no noticeable increase or decrease in property values since 1993. The Mortgagee also presented the testimony of an appraiser well known to this court, Robert Ludwig, who valued the Home at $14,000. Both appraisers used a comparable sales approach in determining the value of the Home.

## C. DISCUSSION

The Wife proposes to modify the Debtors' 2nd Plan to provide for a payoff of the amount of the secured portion of the Mortgagee's claim. As this court held in *In re Cole*, 202 B.R. 375, 380 (Bankr.E.D.Pa.1996), *aff'd*, C.A. No. 96–8329 (E.D. Pa. April 1, 1997), the decision in *Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), precluded bifurcation of an undersecured creditor's claim in a Chapter 13 case in which a plan of reorganization involved is a cure plan. However, we further noted that, if a debtor's Chapter 13 plan seeks to liquidate the entire claim of a creditor in that plan, the creditor's claim can be bifurcated. *Id.* at 381. Thus, in the case at hand, since the Debtors' proposed 3rd Plan seeks to

liquidate Mortgagee's entire claim and is not just an attempt to cure arrearages owed to Mortgagee, the Mortgagee's claim could be bifurcated without violating the precepts of *Dewsnup.*

Subsequent to *Dewsnup*, it was held, in *Nobelman v. American Savings Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), that § 1322(b)(2) prohibits a chapter 13 debtor from relying on § 506(a) to reduce an undersecured homestead mortgage to the fair market value of the mortgaged residence. However, § 1322(b)(2) is inapplicable where, as here, a mortgagee holds a security interest in items in addition to a debtor's residence, specifically the sort of broad security interest in appliances, fixtures, and machinery contained in the instant mortgage. *See In re Johns*, 37 F.3d 1021, 1024 (3d Cir.1994); and *In re Hammond*, 27 F.3d 52, 56 (3d Cir.1994). Therefore, if the Debtors are entitled to amend the 2nd Plan and allowed to proceed pursuant to the terms of the 3rd Plan, the bifurcation requested by the Debtors in the 3rd Plan would be permissible. Although several issues relevant to resolution of the Proceeding remain open, notably the valuation of the Home between $10,000 and $14,000; the proper date from which the valuation should be measured, *see In re Jablonski*, 88 B.R. 652, 654–55 (E.D.Pa. 1988) (confirmation date); and *In re Wood*, 190 B.R. 788 (Bankr.M.D.Pa.1996) (date generally that of filing); and the proper rate of deferral interest, *see General Motors Acceptance Corp. v. Jones*, 999 F.2d 63 (3d Cir. 1993) (market rate of comparable loans, not lower Pennsylvania judgment rate, applies), these issues need not be reached because, as we decide herein, the Motion cannot be granted.

Section 1329(a) of the Bankruptcy Code provides the authority for permitting the post-confirmation modification of a Chapter 13 plan. This Code section states that a debtor, trustee or holder of an allowed unsecured claim can seek to modify a confirmed chapter 13 plan of reorganization to

(1) increase or reduce the amount of payments on claims of a particular class provided for by the plan;

(2) extend or reduce the time for such payments; or

(3) alter the amount of the distribution to a creditor whose claim is provided for by the plan to the extent necessary to take account of any payment of such claim other than under the plan.

11 U.S.C. § 1329(a).

The Mortgagee opposes the proffered modification of the 2nd Plan requesting that such request be denied for the following reasons:

First and foremost, the prior confirmation order is *res judicata*. Second, Debtor has not demonstrated any "cause" or changed circumstances which warrant the modification. Third, Debtor is estopped from seeking further modification of her plan. Fourth, there is no credible timely evidence of valuation to support Debtor's request, and fifth, a "cramdown" is not allowed in a "cure" plan.

*See* Brief of First Union in Opposition to First–Confirmation Modification of Plan, at 2.

The starting point of the Mortgagee's analysis is therefore the principle, clearly developed in a non-§ 1329 context, that "a confirmation order is *res judicata* as to all issues decided or which could have been decided at the hearing on confirmation." *In re Szostek,* 886 F.2d 1405, 1408 (3d Cir.1989). *See also In re Rothman,* 206 B.R. 99, 105 (Bankr. E.D.Pa.1997). The nub of the question is how far this principle can be applied to the issue of Chapter 13 plan modification.

The only case in which we considered this issue was *In re Gronski,* 86 B.R. 428 (Bankr. E.D.Pa.1988). That case involved a motion of creditors to modify the debtor's confirmed Chapter 13 plan of reorganization, principally because they were able to show that the debtor had accumulated substantial savings due to post-confirmation changes in his financial circumstances. Thus, it was in addressing a motion by creditors that we stated, in dicta, that "the power of a debtor to request post-confirmation amendments is much broader than that of a creditor." *Id.* at 432, citing *In re Evans,* 66 B.R. 506, 511 (Bankr. E.D.Pa.1986), *aff'd,* 77 B.R. 457, 459–60 (E.D.Pa.1987). Further, after noting the application of *res judicata* principles to the creditors' motion, we stated, as to a debtor's motion, that these principles are "at least to some degree, a two-way street." *Id.* at 432.

Two leading commentators on § 1329 agree that principles of *res judicata* apply to motions invoking that Code section unless there has been a substantial post-confirmation change in the debtor's circumstances. *See* 5 COLLIER ON BANKRUPTCY, ¶s 1329.02, 1329.03, at 1329–5 to 1329–6 (rev. 15th ed.1996); and H. Deffebach, *Post–Confirmation Modification of Chapter 13 Plans: A Sheep in Wolf's Clothing,* 9 BANK. DEV. L.J. 153, 158–62 (1992). Many courts agree. *See, e.g., In re Arnold,* 869 F.2d 240, 243 (4th Cir.1989); *In re Sharpe,* 122 B.R. 708 (E.D.Tenn.1991); *In re Butler,* 174 B.R. 44, 47 (Bankr.M.D.N.C.1994); *In re Banks,* 161 B.R. 375, 376–77 (Bankr.S.D.Miss.1993); and *In re Algee,* 142 B.R. 576, 579 (Bankr.D.D.C. 1992).

The principle that *res judicata* precludes or even limits modification under § 1329(a) is challenged, however, in *In re Witkowski,* 16 F.3d 739, 742–46 (7th Cir.1994), a case affirming a motion by a trustee to hold the debtor to the plan provisions regarding the total of payments to be made even though this would result in payments to creditors in a higher percentage than the plan required.[1] The *Witkowski* court takes issue with the rather mild statements of *Arnold* that *res judicata* may apply, finding, 16 F.3d at 744–45, that

[t]he common-law principle of *res judicata,* however, does not apply "when a statutory

---

1. The result in *Witkowski* is easily justifiable on the basis that the plan was ambiguous as to what it would provide if the "pot" generated was in excess of the amount necessary to pay the recited percentage and should be construed against the debtor as its draftsmen. *Cf. In re Greenburgh,* 151 B.R. 709, 718–19 (Bankr.E.D.Pa.1993). The court's pronouncements on § 1329 generally are therefore probably unnecessary to resolution of that dispute.

purpose to the contrary is evident." ' *Astoria Federal Sav. and Loan Ass'n v. Solimino,* 501 U.S. 104, [108], 111 S.Ct. 2166, 2170, 115 L.Ed.2d 96 (1991), quoting *Isbrandtsen Co. v. Johnson,* 343 U.S. 779, 783, 72 S.Ct. 1011, 1014, 96 L.Ed. 1294 (1952)....

Similarly, the statutory framework of the Bankruptcy Code plainly assumes the possibility of modifications of bankruptcy plans after they are confirmed. Section 1327 of the bankruptcy code provides that: "the provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan." § 1327. Congress, however, also provided a mechanism to change the binding effect of § 1327 when it passed § 1329 to allow for modifications. "If the drafters of the Bankruptcy Code intended for a confirmation hearing to have *res judicata* effect, there would be little or no reason for Section 1329." *In re Williams,* 108 B.R. 119, 123 (Bankr.N.D.Miss.1989). Moreover, Congress could have specifically imposed a precondition to a § 1329 modification, but it did not do so. In fact, where it deemed appropriate, Congress could have specifically provided a "change in circumstance" prerequisite under another provision of the Bankruptcy Code. § 1328(b). *See In re Phelps,* 149 B.R. 534, 538 (Bankr.N.D.Ill.1993); *In re Powers,* 140 B.R. 476, 479 n. 3 (Bankr.N.D.Ill.1992). This provision makes it clear that Congress did not intend the common law doctrine of *res judicata* to apply to § 1329 modifications. Accordingly, we disagree with *Arnold* (footnote omitted).

Similar reasoning is found in, *e.g., In re Emly,* 153 B.R. 57, 58 (Bankr.D.Idaho 1993); and *In re Frost,* 96 B.R. 804, 808 (Bankr. S.D.Ohio 1989), *aff'd,* 123 B.R. 254 (S.D.Ohio 1990). *See also In re Anderson,* 153 B.R. 527 (Bankr.M.D.Tenn.1993); *In re Rimmer,* 143 B.R. 871 (Bankr.M.D.Tenn.1992); and *In re Jock,* 95 B.R. 75 (Bankr.M.D.Tenn.1989)

(all holding, contrary to *Sharpe, supra,* that a debtor may modify a plan to revise the treatment of a secured claim when the collateral is eliminated).

We believe that there is much to be said for the *Witkowski* approach to § 1329(a). Adoption of its principles would deflate much of the first and second reasons cited by the Mortgagee, *see* page 832 *supra,* in opposition to the Motion. We note that the fourth and fifth reasons cited by the Mortgagee do not make a great deal of sense. The 3rd Plan, if allowed to supersede the 2nd Plan, would *be* a payoff, not a cure, plan. Resolution of the precise valuation figure is admittedly somewhat difficult, although it seems clear that the value of the Home, at all pertinent times, was between $10,000 and $14,000.

Our difficulty with the Debtors' position arises from our consideration of the Mortgagee's third argument, *i.e.,* that equitable considerations should estop these Debtors from modifying the 2nd Plan at this late juncture, in light of the history leading to its confirmation. It must be recalled that the 2nd Plan was a negotiated compromise between the Debtors and the Mortgagee at a time when the Debtors were faced with a certification of default of the Stipulation by which the Mortgagee had agreed to forebear from foreclosing on the Home. These negotiations were conducted by the Cibik firm, which continues to represent the Husband, and not by suspended lawyer Turner. We are most reluctant to allow the Debtors, for the second time and when it serves solely their purposes at this time to do so, to switch once again from a cure plan to a payoff plan.

We note that the Debtors have, at their disposal, the right to propose a cure plan upon their discharge in the instant case or the voluntary or involuntary dismissal of this case. It would be most difficult for the Mortgagee to argue that any sort of *res judicata* or estoppel should follow the Debtors into a totally new bankruptcy case. *Compare In re Oglesby,* 150 B.R. 620, 625–26 (Bankr.E.D.Pa.), *vacated & remanded,* 158

B.R. 602 (E.D.Pa.1993), *reinstated,* 161 B.R. 917 (Bankr.E.D.Pa.1993), *aff'd,* C.A. No. 94–0617 (E.D. Pa. April 7, 1994). The only difficulty which we perceive that the Debtors would have with the dismissal/refiling exercise on this record, in addition to potential application of 11 U.S.C. § 109(g)(2) in the case of a voluntary dismissal, is that such an approach would frustrate their attempt to reallocate the payments presently credited towards arrearages to the payoff balance, possibly liquidating this balance from the arrearage payments already made by them.

We note that, in *Williams, supra;* and *Frost, supra,* the respective debtors were, like the instant Debtors, attempting to convert a cure plan into a payoff plan, and that they were permitted to do so. However, both of the respective debtors' motions to amend were prosecuted early in the respective cases. *See Williams, supra,* 108 B.R. at 119–20; and *Frost, supra,* 96 B.R. at 805–06. When a debtor made a similar attempt much later in the course of a case, the effort was rebuffed in *Algee, supra,* 142 B.R. at 580–82.

No debtors' effort to reallocate arrearage payments is referenced in *Williams, Frost,* or *Algee.* Therefore, the instant Debtors ask us to go farther than any of those courts were asked to do. It is, moreover, this aspect of the Motion which heightens its inequities.

Not only do the Debtors desire to alter significantly the treatment accorded a secured creditor under the 2nd Plan, but they seek to retroactively credit all payments tendered under the 2nd Plan in a different fashion. The Debtors do not propose to allocate any portion of the arrearage payments as credits against the unsecured portion of the Mortgagee's claim. No consideration in this approach has been given to the effect of any depreciation of the value of the collateral. *Compare Algee, supra,* 142 B.R.

at 582 n. 8 ("The danger in allowing modification of a plan to allow surrender of collateral after confirmation of a plan providing for the debtor's retention of the collateral is that the collateral may have declined in value in an amount greater than payments to the secured creditor.").

No reported case goes so far in allowing debtors to thus realign their obligations in effecting plan modification. We will not allow the Debtors to do so here. *Cf. In re Tuan Tan Dinh,* 90 B.R. 743, 745–46 (Bankr. E.D.Pa.1988) (discharge order, like a confirmation order, will not be undone, despite the debtor's errors in obtaining it, when another interested party objects and establishes unfair prejudice to it as a result).

We will therefore deny the Motion and consequently dismiss the Proceeding because we find that the Motion comes too late in the history of this case,[2] being about a year prior to its running its five-year course, and after the Debtors have accepted the benefits from the Stipulation to proceed with a cure plan in their 2nd Plan. It is inequitable to allow them to, for the second time, to completely change their course in their treatment of the Mortgagee, at least in the context of this case as opposed to a successor Chapter 13 case.

### D. CONCLUSION

An Order denying the Motion and dismissing the Proceeding will therefore be entered. The TMTD is denied due to the unrebutted evidence of record that the delinquencies in the payments to the Trustee have been cured.

---

**2.** We recognize that a § 506 proceeding can be prosecuted subsequent to confirmation. *See In re Lewis,* 875 F.2d 53 (3d Cir.1989). However, a post-confirmation § 506 proceeding is generally of limited benefit to debtors. *See In re Owens,* 132 B.R. 293, 296–97 (Bankr.E.D.Pa.1991). We

further note that a failure to clarify the precise effects of a payoff plan upon a secured claim may result in significant subsequent confusion regarding the rights of the secured claimant in reference to the debtor. *See Coffin v. Malvern Federal Savings Bank,* 90 F.3d 851 (3d Cir.1996).